

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

NATIONAL PRODUCTION WORKERS )
UNION TRUST, )
                              )
          Plaintiff, )
                              )    No. 05 C 5415
vs. )    District Judge Kendall
                              )    Magistrate Judge Schenkier
CIGNA CORPORATION and LIFE )
INSURANCE COMPANY OF NORTH )
AMERICA, )
                              )
                              )
          Defendant. )

## MEMORANDUM OPINION AND ORDER

This diversity action has its origins in a September 1, 2003 agreement ("the Agreement")

between plaintiff, National Production Workers Union Trust ("the Trust"), and one of the

defendants, Life Insurance Company of America ("LINA"), for the purchase of a group life insurance

policy. According to the allegations of the complaint, the policy provides a benefit of $100,000 upon

the death of a participant of the Trust. The underlying dispute in this case arises out of the parties'

disagreement over how that payment is to be distributed.

The Trust alleges that the Agreement provides that upon the death of a Trust participant, the

$100,000 death benefit is to be distributed in equal shares to the participant's designated beneficiary

and to the Trust – that is, each should receive $50,000 (Compl. ¶ 9). LINA disagrees, and asserts

that the designated beneficiary is entitled to the full death benefit, and that the Trust is entitled to

receive none of it (CIGNA's Reply Mem., at 6 (Heindl letter, Ex. C; Heindl Aff., Ex. I). Thus, upon

the death of a Trust participant, LINA has refused to pay the Trust its claimed $50,000 share (Compl.

¶¶ 18-19). Instead, LINA claims that it paid the entire $100,000 to the decedent employee's two children in equal shares (Def.'s Mem., Ex. C (08/18/04 Heindl letter)). The Trust alleges that subsequent communications with LINA and with defendant CIGNA Corporation, LINA's indirect parent corporation, failed to resolve the matter, and that LINA has disavowed the Agreement (Compl. ¶ 19). The Trust then filed this action against LINA and CIGNA Corporation, seeking rescission of a Agreement and a refund of $382,332.50, the amount that the Trust paid in premiums for the group life insurance.

Shortly after the suit was filed, CIGNA Corporation (but not LINA) moved to dismiss the complaint for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). In a Memorandum Opinion and Order dated January 13, 2006 (doc. # 26), the presiding district judge denied the motion without prejudice. In so doing, the district judge found that there was "a material question of fact as to whether CIGNA Corporation was a parent corporation doing business through its subsidiary, LINA, sufficient to subject it to personal jurisdiction in Illinois" (doc. # 26: Mem. Op. and Order at 4).

Since that ruling, the case has been transferred to a different district judge (doc. # 29), who referred the case to this Court (doc. # 53). The parties then consented to this Court's jurisdiction on a limited basis, solely for purposes of adjudicating CIGNA Corporation's challenge to personal jurisdiction (doc. # 72). The parties have engaged in extensive discovery to flesh out the factual matters raised by CIGNA Corporation's jurisdictional challenge. That discovery has now been completed, and CIGNA Corporation has renewed its motion to dismiss for lack of personal jurisdiction (doc. # 12) (which was denied without prejudice in the January 13, 2006 ruling (doc. #

26)).  For the reasons that follow, we grant CIGNA Corporation's motion to dismiss all claims against defendant CIGNA Corporation, pursuant to Fed. R. Civ. P. 12(b)(2).[1]

## I.

A federal district court sitting in diversity has personal jurisdiction over the parties "only if a court of the state in which it sits would have such jurisdiction." *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1275 (7th Cir. 1997) (internal citation omitted).  In Illinois, a plaintiff has the burden of demonstrating personal jurisdiction. *Id. See also Central States v. Reimer Express World Corp.*, 230 F.3d 934, 942-43 (7th Cir. 2000).  However, the party asserting personal jurisdiction need only make, in the first instance, a *prima facie* showing that jurisdiction exists. *See Saylor v. Dyniewski*, 836 F.2d 341, 342 (7th Cir. 1988).  The Court must accept all well-pleaded facts as true unless controverted by the defendant's affidavits. *Id.*  Any factual disputes must be resolved in favor of the plaintiff. *Id.*

Personal jurisdiction exists only if it is consistent with the Illinois long-arm statute, the Illinois Constitution, and the due process clause of the Fourteenth Amendment. *RAR*, 107 F.3d at 1276.  "Because the Illinois statute authorizes personal jurisdiction to the constitutional limits, there are really only two constitutional inquiries – one state and one federal." *Id.*  Personal jurisdiction will lie only if both state and federal due process standards are met. *Id.*

These state and federal constitutional inquiries are separate ones, as "[t]he Illinois Supreme Court has made clear that the Illinois due process guarantee is not necessarily co-extensive with

---

[1] In his Memorandum Opinion and Order, the district judge indicated an evidentiary hearing would be necessary to resolve the jurisdictional issue (doc. # 26: Mem. Op. and Order at 4).  However, discovery has revealed that the facts material to the jurisdictional questions are not in dispute; rather, the parties quarrel over the significance.  Thus, the parties have not sought an evidentiary hearing on the motion to dismiss, and we likewise conclude that it is unnecessary to conduct one.

3

federal due process protections." *RAR*, 107 F.3d at 1276 (citing, *Rollins v. Ellwood*, 565 N.E.2d 1302, 1316 (Ill. S.Ct. 1990)).  The desire to avoid deciding federal constitutional issues whenever possible ordinarily would lead us to consider first the state constitutional question.  However, both because "the Illinois courts have given little guidance as to how state due process protection differs from federal protection in the context of personal jurisdiction," *RAR*, 107 F.3d at 1276, and because the parties have focused their briefing on federal due process requirements, we will consider first the federal requirements.

Under the Fourteenth Amendment, due process requires that a defendant must have purposefully established "minimum contacts" with the forum in order to be subject to personal jurisdiction within that forum. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474-76 (1985) (citing *International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945)).  The crucial inquiry is whether the defendant's conduct and connection with the forum is such that the defendant should reasonably anticipate being hailed into court there. *Id.* at 474.  To establish such reasonable anticipation, the defendant must have purposefully availed itself of the privilege of conducting activities in the forum, invoking the benefits and protections of its laws. *Id.* at 474-75.  Once minimum contacts have been established, other factors – such as whether "maintenance of the suit" will "offend traditional notions of fair play and substantial justice," – must be considered. *Id.* at 476-77.

Under the minimum contacts test, the factors that matter most in the determination of personal jurisdiction are: (1) prior negotiations to a contract and the contemplated future consequences of the contract; and (2) the terms and parties' actual course of dealing.  These are the types of contacts that reflect whether the defendant purposefully established minimum contacts with the forum. *Burger King,* 471 U.S. at 479.  "Generalized foreseeability of the defendant's action

4

causing harm in the forum is not sufficient for the exercise of jurisdiction." *Burger King,* 471 U.S. at 474.

There are two types of personal jurisdiction: specific and general. *See Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 n.8 (1984). Specific jurisdiction refers to jurisdiction over a defendant in a suit "arising out of or related to the defendant's contacts with the forum." *Id.* In other words, the defendant must purposefully direct its activities to the forum and the litigation must result from alleged injuries that arise out of or relate to those activities. *Burger King,* 471 U.S. at 472. General jurisdiction, on the other hand, is permitted only where the defendant has "continuous and systematic general business contacts" with the forum. *Id.* With respect to personal jurisdiction over corporations (such as CIGNA Corporation), the general rule is that stock ownership in or affiliation with a corporation, standing alone, is not a sufficient minimum contact to support personal jurisdiction. *Central States,* 230 F.3d at 943 ("constitutional due process requires that personal jurisdiction cannot be premised on corporate affiliation or stock ownership alone where corporate formalities are substantially observed and the parent does not exercise an unusually high degree of control over the subsidiary"). Rather, the parent must "exercise an unusually high degree of control over the subsidiary," such that there is a pattern of business activity which would provide fair warning to the parent that it would be subject to suit in the forum state. *See Central States,* 230 F.3d at 943-44; *see also Burger King,* 472 U.S. at 472.

## II.

In this case, plaintiff seeks to establish both general and specific personal jurisdiction over defendant. Plaintiff's principal argument is that this Court has general personal jurisdiction because CIGNA Corporation conducts business through its co-defendant in this case, LINA, in a continuous

and systematic way such that it exercises an unusually high degree of day-to-day operational and/or management control over LINA (Pl.'s Resp. Mem. at 19). Plaintiff's alternative argument is that this Court has specific personal jurisdiction over defendant based on specific contacts that defendant made regarding the life insurance policy at issue in this case (*Id.*). The evidence fails to establish either prong of personal jurisdiction.

## III.

We begin with specific jurisdiction first, even though it is an alternative argument, because it involves a discrete set of evidence that can be quickly removed from consideration. There are two categories of evidence offered by plaintiff to support the existence of specific, personal jurisdiction. The first is the affidavit of Mr. Walter Heindl, Senior Counsel to CIGNA Corporation, and a letter that he sent to the Trust regarding the life insurance policy at issue. The second is the testimony of plaintiff's Rule 30(b)(6) representative, Ms. Susan Schreiner, the Trust's Insurance Coordinator. As we explain below, this evidence fails to establish specific personal jurisdiction.

### A.

The Trust claims that the "most significant act pertaining to the subject of this litigation, to wit, the 'disavowal' of the group policy," was a letter sent by Mr. Heindl that communicated defendant LINA's termination of the purported Agreement, and stated that the reason for the termination was that there was no "'meeting of the minds' regarding its terms" (Pl.'s Resp. Mem. at 4). Plaintiff argues that this letter establishes that CIGNA Corporation, through its employee and agent Mr. Heindl, acted on behalf of LINA with respect to the purported contract and within this forum (Pl.'s Resp. Mem. at 2, 19). Thus, argues plaintiff, this one contact creates specific personal jurisdiction over the CIGNA Corporation (*Id.*).

We disagree. Although Mr. Heindl is indisputably employed by CIGNA Corporation, it also is undisputed that Mr. Heindl told the Trust that he wrote the letter on behalf of LINA and not CIGNA Corporation (Def.'s Reply, Ex. C (Letter)). Plaintiff has offered no evidence that Mr. Heindl was doing CIGNA Corporation's bidding – rather than LINA's – when he wrote the letter. On the contrary, Mr. Heindl's statement that he acted at LINA's direction, and not at CIGNA Corporation's direction, is unrebutted (Def.'s Reply, Ex. I, ¶ 3). And, plaintiff has failed to rebut the evidence offered by CIGNA Corporation that it charged LINA for Mr. Heindl's services (Def.'s Reply at 17, Ex. B, CIG 00979-80, 913; Def.'s Mem. Ex. B, Barlow Dep. at p. 35). On these facts, LINA's use of the legal services of CIGNA Corporation to handle a dispute between LINA and the Trust, rather than hiring a different lawyer, does not create specific personal jurisdiction over CIGNA Corporation.[2]

## B.

The second category of evidence offered by plaintiff to support the existence of specific jurisdiction is the deposition testimony of Ms. Schreiner as it relates to prior negotiations and course of dealing regarding the life insurance policy at issue (*i.e.,* the factors that the Supreme Court in *Burger King* found to be most important in determining whether minimum contacts exist). Ms. Schreiner testified, on behalf of the Trust, as to all facts related to the allegation of personal jurisdiction over CIGNA Corporation. This deposition testimony reveals the following undisputed facts regarding specific jurisdiction (*i.e.,* related to the life insurance contract that gave rise to this

---

[2]Plaintiff points out that Mr. Heindl's letter was written on stationery bearing the "CIGNA" logo (Pl.'s Resp. Mem. at 17). As we discuss below, the "CIGNA" logo is not the same thing as the "CIGNA Corporation" logo. In any event, the logo on the letterhead does not trump Mr. Heindl's express – and unrebutted – statement in the letter that he was acting on behalf of LINA and not CIGNA Corporation.

cause of action): (1) that it was LINA, not defendant, which issued the life insurance policy at issue; (2) that the subscription agreement and group policy application refer to LINA, not CIGNA Corporation; and (3) that it was LINA, not defendant, that received the premium payments in its name from the plaintiff (Def.'s Mem. at 4, Ex. A, at 49, 74-75; 91). In addition, Ms. Schreiner testified that the name "CIGNA Corporation" did not appear in any correspondence or emails received regarding the group life policy, or on the collection notices for premium payments; and, the collection people who sought payment of premiums from LINA did not say they were from "CIGNA corporation" (Def.'s Mem. at 4, Ex. A, p. 54-55). Ms. Schreiner's testimony fails to support the Trust's claims of specific personal jurisdiction.

## IV.

We now turn to plaintiff's attempt to establish general personal jurisdiction. Plaintiff seeks to establish this basis for personal jurisdiction on the ground that, under *Central States*, LINA's contacts with Illinois can be imputed to CIGNA Corporation because CIGNA Corporation exercises an unusually high degree of day-to-day control over LINA.

A host of undisputed facts undermine the claim that CIGNA Corporation exercises that kind of control over LINA. The uncontradicted Rule 30(b)(6) testimony of Mr. Franklin C. Barrow, one of CIGNA Corporation's accounting directors, shows that CIGNA Corporation does not sell any products or services, including insurance (Def.'s Mem., Ex. B (Barrow Dep.), at 44).[3] Rather, insurance products are sold only by indirect or wholly-owned operating subsidiaries of CIGNA Corporation, such as LINA (*Id.*). Moreover, while CIGNA Corporation supplies certain

---

[3]*See also* Def.'s Mem., Ex. C (LINA's Response to First Set of Discovery), at 6 ( CIGNA Corporation has not contracted to service any insurance policies underwritten and sold by LINA).

administrative service to LINA, the evidence shows that any expenses related to those services are charged back to LINA by CIGNA Corporation, just as those expenses are charged back to all of CIGNA Corporation's indirect subsidiaries (*Id.,* at 35). Only the costs directly associated with CIGNA Corporation's own board of directors and corporate secretary are borne by CIGNA Corporation directly (*Id.*).

In addition, the evidence related to corporate affiliation between CIGNA Corporation and LINA cuts against the exercise of personal jurisdiction in this case. CIGNA Corporation is the *indirect* parent of LINA; it is not the direct parent, nor is it even the grandparent of LINA. Rather, it is separated by at least two corporate degrees from LINA in the corporate hierarchy. LINA is a wholly-owned subsidiary of Connecticut General Corporation ("CGC"), a Connecticut Corporation, which is a wholly-owned subsidiary of CIGNA Holdings, Inc., a Delaware corporation, which in turn is a wholly-owned subsidiary of CIGNA Corporation. In other words, the corporate chain goes from LINA up to CGC, up to CIGNA Holdings, and then up to CIGNA Corporation. Thus, as CIGNA Corporation puts it in its reply, LINA is a third-tier subsidiary of CIGNA Corporation (Def.'s Reply at 1, n.1 (Barlow Aff., ¶ 9, Reply Ex. A).[4]

The undisputed evidence further shows that CIGNA Corporation and LINA observes all corporate formalities. The entities maintain separate books and records (Def.'s Reply E's. B-C; Pl.'s Resp., Ex. N). The evidence further shows that this formal separation also reflects the manner in which the entities conduct business. No persons are jointly employed by CIGNA Corporation and LINA (Def.'s Mem. Ex. C, p. 4; Ex. D, p.7). CIGNA does not sell any insurance products or

---

[4]And, as we noted above, the mere fact that CIGNA Corporation owns stock of LINA does not establish minimum contacts with Illinois. *Central States,* 230 F.3d at 943. Were it otherwise, personal jurisdiction always could be asserted over a parent due to conduct of its subsidiary – a proposition that plainly is not the law.

9

services (Def.'s Mem. Ex. B, p. 44), nor has it ever contracted to service insurance policies underwritten or sold by LINA (Def.'s Mem. Ex. C, p. 6). CIGNA Corporation has never paid any insurance obligations of LINA (Def.'s Mem. Ex. B, p. 80), nor has it had any involvement with LINA's issuance of the group policy that the Trust seeks to rescind (Def.'s Reply Ex. D (Supp. Aff. of Franklin Barrow) ¶ 2-4). Moreover, LINA was not required to consult with or obtain authorization from CIGNA Corporation before it issued the plaintiff's life insurance policy, and CIGNA Corporation did not know the present policy existed when it was issued on September 1, 2003, prior to the filing of this lawsuit (Def.'s Reply Ex. D, ¶¶ 2-3).

Against this evidence, the Trust offers a variety of evidence that, according to the Trust, shows the unusually high degree of control that *Central States* requires in order to impute the acts of a subsidiary to a parent (or third-tier parent) corporation. We discuss below the evidence the Trust cites, which we find insufficient to establish personal jurisdiction over CIGNA Corporation.

## A. Confusion.

The Trust seeks to show that there is personal jurisdiction over CIGNA Corporation by arguing that there is confusion regarding the use of the CIGNA mark by LINA with respect to both LINA's general business dealings, as well as with respect to the purported Agreement and negotiations and course of dealing regarding that Agreement. This confusion over the CIGNA mark, argues plaintiff, reflects the fact that CIGNA Corporation is really doing its own business through LINA and is therefore functionally present in Illinois, even though CIGNA Corporation and LINA observe corporate formalities.

To support this theory, the Trust points to deposition testimony by Mrs. Mary Elizabeth O'Hara, a service representative formerly of LINA, who now works for a different subsidiary of

10

CIGNA Corporation. According to plaintiff, Ms. O'Hara's deposition shows that she: (1) confused the identity of Mr. Heindl, whom she stated was employed by LINA and CIGNA Life Insurance Company of New York ("CLICNY") as well as paid by those subsidiaries for his legal work (Pl.'s Resp. Mem. Ex. G, pp. 23-24); and (2) "mistakenly believed" that "CIGNA Group Insurance" "was not a division of CIGNA Corporation but rather an in-house term used to describe products sold by . . . LINA and [CLICNY]" (Pl.'s Mem. at 5; Pl.'s Mem. Ex. G, pp. 16-17). Plaintiff also points to deposition testimony by Mr. Christopher Tillotson (LINA's Rule 30(b)(6) designee) and Mr. Barlow (CIGNA Corporation's Rule 30(b)(6) designee) to show that both men think that "CIGNA Group Insurance" is not a separate division of CIGNA Corporation with its officers, but rather a label for a business group within the CIGNA corporate hierarchy that deals with insurance business. Finally, plaintiff touts as its "smoking gun" an online biography of Ms. Karen Rohan, who describes herself as the President (and thus an officer) of LINA, CLICNY *and* CIGNA Group Insurance. According to plaintiff, this online biography proves that both employees and corporate designees of the defendants do not know the functional difference between CIGNA Corporation and LINA, despite the facade of corporate formalities (Pl.'s Resp. Mem. at 13-14).

This argument goes nowhere, because the evidence does not show any control by CIGNA Corporation over LINA – much less an unusually high degree of day-to-day control. It is not relevant to the issue of minimum contacts whether CIGNA Corporation's employees are confused about corporate structure, the employment relationship of other employees, or whether "CIGNA Group Insurance" is a term to describe the type of business done by the CIGNA Corporation subsidiaries that sell insurance products or whether it is a separate corporate division. "CIGNA Group Insurance" is not a party to this case, and it does not matter whether that name is a term of art

11

or a corporation. None of this evidence controverts the evidence cited above, indicating that CIGNA Corporation is not dictating LINA's business decisions. Thus, we fail to see how any confusion about the use of the CIGNA mark by LINA and/or CIGNA Corporation employees shows that CIGNA Corporation purposefully availed itself of the benefits of Illinois law by doing its business through LINA.

## B. Annual Reports and Tax Returns.

Plaintiff next asserts that statements made by defendants in certain publications are "admissions" that CIGNA Corporation is "doing business through its subsidiary LINA." As support for this assertion, plaintiff cites to the statement in the earlier ruling in this case that some of the factors mentioned by Illinois courts necessary to find that a parent controls a subsidiary's day-to-day operations appeared to be present in this case (*i.e.*, holding company, national name recognition advertising and use of the corporate logo) (Pl.'s Resp. Mem. at 6-7, citing doc. # 26: Mem. Op. and Order at 4). For example, plaintiff points to the 2003 Annual Shareholder Report by CIGNA Corporation's CEO, H. Edward Hanway, who stated:

> We've established a new operating model more appropriately aligned to our core strengths in health care and related benefits. We'll no longer be a company of free-standing divisions, each with its own staff and practices. We now operate as a single company with well-defined businesses better equipped to deliver the health care and related benefits and services our customers require . . . . [W]e're *primarily eliminating management layers* [emphasis added] and administrative staff, as well as redundant staff in various functional areas.

(Pl.'s Resp. Mem., Ex. L, CIG 00122). Plaintiff also quotes from a 2004 CIGNA Group Insurance Annual Report wherein the CIGNA Corporation calls itself an "organization" that provides group life insurance (Pl.'s Resp. Mem., Ex. L, CIG 00207).

12

In addition, plaintiff points to Illinois tax returns that plaintiff says show that CGC, which is a subsidiary of CIGNA Corporation and the direct parent corporation of defendant LINA, is the "controlling" corporation of LINA on the LINA tax return. Plaintiff cites Schedule UB of the tax returns for the proposition that defendants LINA and CIGNA Corporation, through the parent/subsidiary CGC, "have voluntarily declared that they are a 'unitary business group'" (Pl.'s Resp. Mem. at 8, Ex. M, CIG 01399). According to plaintiff, this proves that, although LINA and CIGNA Corporation are formally separate, they functionally act as "one" for purposes of financial reporting.

We conclude that none of these pieces of evidence support a claim that CIGNA Corporation exercises an unusual degree of control over LINA's day-to-day operations. We address each item of evidence below.

### 1. Annual Reports.

The 2003 Annual Report statement by CEO Hanway and the 2004 Annual Report statement fail to show control by CIGNA Corporation over LINA. There is no evidence that LINA is not, in fact, a free-standing subsidiary of its indirect third-tier parent with all of its corporate formalities in place; thus, there is no reason to credit this Annual Statement, which has no direct reference to LINA, as anything more than a statement of general intent for CIGNA Corporation. *See Gruca v. Alpha Therapeutic Corp.,* 19 F.Supp.2d 862, 868 (N.D. Ill. 1998) ("we" and "our" in annual report did not overcome parent and subsidiary's separate identities such that subsidiary's forum contacts could be imputed to parent). For the same reasons, we do not find the 2004 Annual Report statement regarding CIGNA Group Insurance (*i.e.,* that it is an "organization") to be probative, let alone

dispositive, evidence on the personal jurisdiction argument. In fact, both the 2003 and 2004 Annual Reports explicitly state:

> CIGNA Corporation is a holding company. *Products and services are provided exclusively by subsidiaries and not by CIGNA Corporation.* Most employees are employed by subsidiaries of CIGNA Corporation

(Def.s' Reply, Ex. C, CIG 00373; Ex. F, CIG 00190; Ex. G, CIG 00270) (emphasis added). This underscores that CIGNA Corporation is not merely using LINA as a conduit for the sale of CIGNA Corporation's own products and services.

## 2. Tax Return.

The tax return "unitary business group" argument fails, at the threshold, because it says nothing about the factor critical to the *Central States* analysis: day-to-day control. *See also IDS Life Ins. Co. v. SunAmerica Life Ins. Co.,* 136 F.3d 537, 540-41 (7th Cir. 1998). The instructions for the tax return require the subsidiaries of a common company to file as a unitary business group under Schedule UB if their operations are dependent on, are integrated with, and contribute to each other (Pl.'s Resp. Mem., Ex. M, Schedule UB). Although the "purpose" of Schedule UB "is to enable a unitary business group to determine the amount of its unitary business income that is attributable to Illinois" (Pl.'s Resp. Mem. Ex M), at most, the fact that LINA and CGC consider their corporations to be a "unitary business group" for purposes of an Illinois tax return (*see* 35 ILCS 5/1501) simply means that the corporate structures of LINA's direct parent, CGC, and LINA are interdependent. The existence of an interdependent corporate structure for tax reporting purposes fails to shed light on whether CIGNA Corporation exercises "unusual control" over LINA on a day-to-day basis.

Thus, we do not agree with plaintiff that Schedule UB means that defendants acknowledge that "despite their being formally separate corporate entities, they are acting as one" (Pl.'s Resp.

14

Mem. at 8). The litmus test of *Central States* is whether a CIGNA Corporation would reasonably foresee being haled into Illinois courts simply because it filed a tax return with LINA in Illinois based on LINA's business as its subsidiary. We don't think the Schedule UB evidence satisfies this litmus test. Thus, we find the Illinois tax return evidence insufficient evidence to subject defendant to general personal jurisdiction in Illinois.

## C. The 2005 LINA Annual Statement.

LINA'S 2005 Annual Statement is also offered by plaintiff to establish personal jurisdiction over CIGNA Corporation. In this Statement, LINA disclosed that its federal income tax return was consolidated with that of defendant CIGNA Corporation and its subsidiaries:

> CIGNA Corporation's indirectly wholly-owned domestic subsidiary insurance companies have entered into a Consolidated Federal Income Tax Agreement (the "Agreement") which became effective as of April 1, 1982. The Agreement sets forth the method of allocation of federal income taxes for CIGNA Corporation and certain of its wholly-owned domestic subsidiaries, including insurance subsidiaries. The Agreement provides for immediate reimbursement to companies with net operating losses to the extent that their losses are used to reduce consolidated taxable income; while those companies with current taxable income as calculated under federal separate provision, are liable for payments determined as if they had each filed a separate return.

(Pl.'s Resp. Mem., Ex N (CIG 00910-12 "Note 9-Income Taxes"). According to plaintiff's interpretation of this statement, LINA is depicting the relationship with other subsidiaries of defendant CIGNA Corporation as "fully financially intertwined, each subsidiaries' losses acting to offset the net income of another" (Pl.'s Resp. Mem. at 9).

We disagree. This statement does not relate to the overall financial structure of the companies, nor does it indicate that the day-to-day operational expenses of the parent and its subsidiaries are "fully intertwined." The statement simply says that the parent will reimburse its

15

subsidiaries for net operating losses that serve to reduce the consolidated tax liability, but if the subsidiaries earn a profit, then each subsidiary is liable for its own resulting tax responsibility. This statement, in our view, respects the separate corporate operations; it does not eliminate them.[5]

Further, to the extent that there are cost-sharing arrangements and/or service contracts between CIGNA Corporation and LINA, separate books and records are kept, and the uncontradicted evidence is that there are appropriate charge backs for all costs that are shared and/or advanced: "CIGNA Corporation allocates to LINA the latter's share of the administrative expenses incurred at the CIGNA Corporation level (Def.'s Reply, Ex. B, CIG 00978, 00913). LINA allocates to the operating subsidiaries to which it provides administrative services a share of its operating expenses (Def.'s Reply, Ex. B, CIG 00912-13, 978)" (Def.'s Reply at 15). Moreover, as defendant also points out, the same pages of LINA's financial records shows payments and credits between other subsidiaries for services charged and charged back to each other. This evidence shows, contrary to plaintiff's position, that corporate formalities are observed and are not simply form over function.

In *Central States,* the Seventh Circuit held that a parent's support of its subsidiaries in terms of administrative services and/or financial reimbursement for various expenses or losses related to administrative services does not rise to the level of a minimum contact under the general personal jurisdiction jurisprudence. 230 F.3d at 945 (corporate parent may provide administrative services "without calling into question the separateness of the two entities for purposes of personal jurisdiction"). *See also Gruca,* 19 F. Supp.2d at 869 (consolidated financial statements did not

---

[5]Moreover, the Seventh Circuit has held that filing joint returns does not create a basis for subjecting a subsidiary to personal jurisdiction, at least where the subsidiary is not under capitalized. *Gruca,* 19 F. Supp.2d at 868-69. Here, the evidence is that LINA has a surplus of $682 million (Def.'s Reply at 8 (citing Reply Ex. B, lines 26 and 38); the Trust offers no evidence that this constitutes undercapitalization.

establish jurisdiction over parent where subsidiary maintained separate books and records and was

not undercapitalized). That is true in this case as well.

## D. Operational Identity.

Plaintiff offers another part of the LINA 2005 Annual Statement to argue that the

"operational identity" of CIGNA Corporation and LINA are one and the same:

> The reporting entity (*i.e.,* defendant LINA) and certain related parties have entered
> into service contracts and cost-sharing arrangements. These arrangements include
> providing or being provided with a computer, claims processing, policy writing,
> maintenance and other services, as well as equipment, supplies and office space.
> CIGNA Corporation, the ultimate parent company, allocates to the reporting entity
> its share of operating expenses incurred at the corporate level. The reporting entity
> also allocated a portion of its operating expenses to affiliated companies for whom
> it performs certain administrative services.

> For the years 2005 and 2004, CIGNA Corporation allocated corporate overhead
> expenses of approximately $46.1 million and $37.2 million, respectively, to the
> Company [defendant LINA]. With the exception of a limited number of expenses
> held at the corporate level such as expenses relating to investment and the servicing
> of debt, all operating expenses of CIGNA Corporation were allocated. The
> allocations were based on work effort studies and similar generally accepted
> accounting principle methods, while other expenses such as outside legal fees were
> directly charged to the related company.

(Pl.'s Resp. Mem., Ex.N (CIG 00912-Note 10, Paragraph F, subparagraph (4)). According to

plaintiff, this statement by LINA indicates that it is fully intertwined with defendant CIGNA

corporation "not just as financial entities for tax purposes but in an operational sense as well" (Pl.'s

Resp. Mem. at 10).

We disagree. While this statement shows that CIGNA Corporation provides administrative

and/or operational services to LINA as its subsidiary, (*e.g.*, legal services, computers, claims

processing, policy writing, and provision of equipment and maintenance), and that it advances

certain costs to LINA during the year for these services, the statement does not show that CIGNA

Corporation controls LINA in a day-to-day operational and/or management sense. For example, there is no evidence that CIGNA Corporation provides the payroll for LINA employees and/or that LINA does not have its own employees and its own budget for paying them. To the contrary, the financial statements reveal that the cost of services provided by CIGNA Corporation to operating subsidiaries is charged back to the subsidiaries (Pl.'s Resp. Mem. Ex. N, CIG 00912015, 980). There is also no evidence that the provision of support services is synonymous with the control of LINA's day-to-day business operations with respect to soliciting new insurance business, issuing policies, or making underwriting decisions on those policies.

In short, the provision of support services (including advanced costs) by CIGNA Corporation to LINA are part and parcel of the normal incidents of a parent-subsidiary relationship; it is not the same as doing business through LINA. Despite the consolidated financial statements and federal tax return, CIGNA Corporation maintains separate books and records from LINA, and there is no evidence that LINA does not have its own budget or make its own financial decisions. When a parent and subsidiary respect corporate formalities, the consolidation of their financial information into one tax return or financial statement does not endanger their separate identities or cause the subsidiary's conduct and forum contacts to be imputed to the parent. *Central States*, 230 F.3d at 945; *Gruca*, 19 F.Supp.2d at 869. *See also Freudensprung v. Offshore Technical Services, Inc.*, 186 F. Supp.2d 716, 723-24 (S.D. Tex. 2002) (parent's forum contacts could not be imputed to subsidiary, although subsidiary was consolidated into parent's federal tax return and financial statement). We therefore find that the cited portion of the 2005 Annual Statement fails to show that CIGNA Corporation exercises "an unusual degree" of control over LINA.

Finally, we find that the evidence that CIGNA's Board Chairman, Chief Executive Officer and/or Chief Financial Officer, or any of their designees, is authorized to approve any guarantees, indemnities, undertakings, commitments or other legally binding agreements in the nature of guarantees of any of the financial obligations of CIGNA Corporation's direct or indirect subsidiaries (Def.'s Mem., Ext. T), without any probative value on the personal jurisdiction question. There is no evidence that LINA in fact was required to obtain authorization from or consult with CIGNA Corporation before issuing this (or any other) group policy, nor did LINA seek or CIGNA Corporation grant such authorization (Def.'s Reply at 10, Ex. D, ¶ 2-4). In general, there is no other evidence offered by plaintiff to demonstrate that CIGNA Corporation ever exercised its approval authority in any of LINA's business dealings, let alone in a continuous and systematic way that would reveal day-to-day control. Thus, the Court finds this argument without merit.[6]

## E. Benefit Plans.

Plaintiff next points to the provision by CIGNA Corporation to LINA employees of a pension plan, stock and incentive plan, a deferred compensation plan, and a health and life insurance plan as evidence that the defendant and LINA are fully intertwined operations (Pl.'s Resp. Mem. at 10-12). Plaintiff cites no case where a court found that the mere provision of these kind of employee benefits drops to the bottom line of minimum contacts necessary to subject a parent corporation to personal jurisdiction in the forum where its subsidiary does business. In our view, the provision

---

[6]On a related point, plaintiff also points to evidence that "[b]oth CIGNA and LINA have their Board meetings at the same location (although, as Defendants are careful to point out, on different floors)." (Pl.'s Resp. Mem. at 18). We do not think that defendant's point that the Board meetings are held on different floors – and thus different rooms – to be inconsequential. If the meetings occur in different rooms then they are separate meetings and thus respectful of separate corporate forms. We fail to see how using the same building for Board meetings is evidence sufficient to establish personal jurisdiction.

welfare plans by a parent to employees of its subsidiary does not constitute the type of day-to-day control or management of the subsidiary necessary to satisfy the *Central States* test.

### F. CIGNA License.

Plaintiff also offers evidence that CIGNA Corporation has licensed the CIGNA logo to its subsidiaries for use in their businesses (*e.g.*, LINA's use of the CIGNA logo on its letterhead), and has provided advertising services such as the CIGNA Corporation website and web address (www.cigna.com), as well as a CIGNA Chicago phone number (Pl.'s Resp. Mem. at 15). The Trust argues that this CIGNA name recognition advertising on behalf of LINA (*Id.* at 18), shows that CIGNA Corporation is doing business through LINA, and that they comprise a single business entity for purposes of day-to-day functioning, despite a "rote disclaimer" on the CIGNA website that the term "CIGNA" sometimes means one of CIGNA Corporation's subsidiaries rather than CIGNA Corporation itself (*Id.* at 15).

We disagree. The CIGNA Corporation disclaimer on the website is sufficient evidence that the trademark name "CIGNA," as licensed to subsidiaries for their use, is distributed within the stream of commerce as a brand name rather than the name of an identifiable corporation that has its identity as a single business. The disclaimer states:

**Products and Services Provided by CIGNA Corporation Subsidiaries**

"CIGNA" is a registered service trademark of CIGNA Intellectual Property, Inc., licensed for use by CIGNA Corporation and its subsidiaries. CIGNA Corporation is a holding company and it [is] not an insurance or an operating company. Therefore, products and services are provided exclusively by subsidiaries and not by CIGNA Corporation. "CIGNA" may refer to CIGNA Corporation itself or one or

20

more of its subsidiaries, but when used in connection with the provision of a product or service, always refers to a subsidiary.

(CIGNA Corporation website, www.cigna.com; Legal Disclaimers).

Nothing on this website nor in this disclaimer suggests that CIGNA Corporation is holding itself out as LINA's partner in LINA's day-to-day operations. Moreover, the plaintiff has not shown that CIGNA corporation and/or LINA "actually sell policies of insurance via the website" (Def.'s Reply at 19). The website is passive because it only provides general information; there is no interactive sales activity on it. A passive website such as this one is not sufficient to create minimum contacts with the forum state. *Erie Foods Int'l v. Apollo Group,* 2006 WL 932344, at *1 (N.D. Ill., Apr. 10, 2006).

## G. Shared Employees.

The plaintiff also argues that there is an overlap between certain employees/officers of CIGNA Corporation and its subsidiaries. For example, plaintiff asserts that Mr. Gregory H. Wolf was, at the time this suit arose, president of CIGNA Group Insurance (what plaintiff claims is a "division" of defendant CIGNA Corporation), as well as two of CIGNA Corporation's subsidiaries: LINA and CLICNY. Plaintiff claims that this overlap in employment by Mr. Wolf between defendant's subsidiaries is evidence that CIGNA Corporation acts as a "single company" (Pl.'s Resp. Mem., Ex S, CIGNA Executives, Gregory Wolf at cigna.com/general/about/executive/corporate/ wolf.html). Similarly, plaintiff points out that Ms. Rohan is now president of both LINA and CIGNA Group Insurance (Pl.'s Resp. Mem., Ex. K).

We do not find the fact that these individuals have held overlapping positions with LINA and CIGNA Group Insurance to be evidence of a control by CIGNA Corporation over LINA. Although

21

the parties dispute whether "CIGNA Group Insurance" is a "division" of defendant CIGNA Corporation, or whether it is merely a name used by LINA and other insurance subsidiaries of defendant CIGNA Corporation to identify certain insurance products, this dispute is not relevant to the question here. The question here is whether defendant CIGNA Corporation purposefully availed itself of this forum's laws and could reasonably foresee being haled into court. The fact that the same person occupied the president position for two or three of defendant's subsidiaries at the same time does not shed light on that question. Thus, we find that CIGNA Corporation should not be tagged with personal jurisdiction based on the activity of its subsidiaries' presidents. It is clear that neither Mr. Wolf nor Ms. Rohan ever held an employment position at both CIGNA Corporation and LINA at the same time. We therefore find this evidence insufficient to establish general personal jurisdiction over defendant.

## H. Political Activity In Illinois.

Plaintiff also points to political activity by CIGNA Corporation in Illinois as evidence of minimum contacts. Although it is undisputed that CIGNA Corporation has made direct contact with Illinois by contributing money to various political candidates and political parties, there is no evidence that any of these contacts establish a continuous and systematic pattern of business activity sufficient to say that defendant exercises any control over LINA and thus falls within the general personal jurisdiction exception.

\* \* \*

To summarize, the disparate items of evidence offered by the Trust fails to show that, despite its observance of corporate formalities, CIGNA Corporation exercises an unusual degree of control

22

over LINA's day-to-day operations. Plaintiff's evidence falls far short of establishing personal jurisdiction over CIGNA Corporation under the *Central States* test.[7]

## CONCLUSION

For the reasons stated above, we conclude that the Trust has failed to establish personal jurisdiction over CIGNA Corporation under federal due process standards.[8] Accordingly, CIGNA Corporation's motion to dismiss (doc. #12) is granted.[9] The Court therefore directs the Clerk of the Court to dismiss defendant CIGNA Corporation from this action. The lawsuit, of course, will continue against LINA, which has the wherewithal to fully satisfy any judgment that plaintiff may achieve.

ENTER:

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

Dated: May 16, 2007

---

[7]In *Central States*, the Seventh Circuit explained that an alternative method of obtaining personal jurisdiction over a parent corporation based on the forum contacts of a subsidiary corporation is where the corporation disregards corporate formalities such that the corporate veil separating the parent and the subsidiary may be pierced. 230 F.3d at 943. The Trust's brief occasionally refers to LINA and CIGNA Corporation as "alter egos" (*see*, Pl.'s Resp. Mem. at 16, 21), but offers no authority and no cohesive argument for piercing the corporate veil. In any event, because the evidence here establishes that in fact LINA and CIGNA Corporation do respect corporate formalities, a veil piercing argument would fail even had the Trust made one.

[8]Because plaintiff has failed to establish personal jurisdiction under federal due process standards, we need not – and do not – address the question of personal jurisdiction under Illinois constitutional standards.

[9]CIGNA invokes Rule 11 in its opening brief opposing plaintiff's decision to join CIGNA Corporation as a defendant, but it does not explicitly seek Rule 11 sanctions. To the extent that CIGNA is requesting sanctions, that request is procedurally defective (*i.e.*, there is no evidence that CIGNA satisfied the "safe harbor" provision in Rule 11(b), and there has been no separate motion under Rule 11(c)(1)(A)). While this Court has authority to consider Rule 11 sanctions on its own initiative, pursuant to Rule 11(c)(1)(B), we conclude that this is not an appropriate case for doing so.