**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**


| | | |
|---|---|---|
| NATIONAL PRODUCTION WORKERS UNION INSURANCE TRUST, | ) ) ) | |
| Plaintiff, | ) ) | Case No.: 05-cv-5415 |
| v. | ) ) | Judge Robert M. Dow, Jr. |
| LIFE INSURANCE COMPANY OF NORTH AMERICA | ) ) ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This action stems from a September 2003 agreement between Plaintiff, National

Production Workers Union Insurance Trust ("the Trust"), and Defendant, Life Insurance

Company of America ("LINA"), for the purchase of two group insurance policies. Between

September of 2003 and July of 2004, the Trust paid $382,332.50 in premiums to LINA under the

policies. On August 18, 2004, following a dispute between the parties regarding the group life

policy's beneficiary provision, LINA exercised its right to terminate the policies, effective

September 30, 2004. LINA billed the Trust for the August and September 2004 premiums, but

the Trust refused to pay those premiums.

In August 2005, the Trust filed this action in Illinois state court against LINA and

CIGNA Corporation (LINA's indirect parent company), seeking rescission of the policies and a

refund of the premiums it paid for those policies.[1] LINA and CIGNA removed the case to

federal court based on both diversity and federal question jurisdiction (the latter on the theory

---

[1] LINA issued two separate policies to the Trust – a group life insurance policy and an accidental death and dismembership ("AD&D") policy. The Complaint refers only to the group life policy. However, it appears from the summary judgment briefing that both parties understand the Trust to be seeking rescission of both policies. Therefore, the Court proceeds under that understanding as well.

that the policy was an Employee Retirement Income Security Act ("ERISA") plan). The Trust's claims against CIGNA, and certain of its claims against LINA, since have been dismissed.[2] The Trust's remaining claims include: a claim for declaratory judgment pursuant to 735 ILCS § 5/2-701 (Count I); a common law rescission claim (Count II), a breach of contract claim (Count III), and a claim for unjust enrichment (Count IV). On October 21, 2008, LINA filed a breach of contract counterclaim seeking to recover unpaid premiums in the amount of $75,295, plus interest and costs. See [180].

Currently before the Court is LINA's motion for summary judgment [195], in which LINA seeks summary judgment in its favor on both the Trust's claims and LINA's counterclaim.[3] For the reasons set forth below, LINA's motion is granted.

---

[2] Following Defendants' removal of the action to federal court, Judge Hibbler dismissed the Trust's claims for negligence (Count V) and for attorney's fees under the Illinois Insurance Code, 215 ILCS § 5/155, on LINA's motion to dismiss. See [26]. Later, Magistrate Judge Scheinker granted CIGNA's motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2). See [137].

[3] Also before the Court is LINA's motion to strike [221] the Trust's surreply [217] on the ground that it was filed without prior leave of court. The Trust responds that it requested leave to file a surreply in open court on November 12, 2009, and that LINA's counsel failed to object. According to the Trust, "the transcript from the proceedings is admittedly slightly ambiguous regarding the Court's position" concerning the Trust's request to file a surreply, but the transcript suggests that the Court contemplated a surreply by the Trust. A review of the transcript resolves any ambiguity perceived by the Trust. On November 12, 2009, the parties were in court on LINA's motion to supplement its Local Rule 56.1 statement of material facts [210]. In open court, counsel for the Trust stated that the Trust had "no objection to it except that we want to have a surreply to it." In an effort to clarify the Trust's position, the Court responded, "so you want * * * to essentially respond to those four additional statements," referring to the four supplemental statements of material fact LINA sought leave to file in its motion to supplement [210]. Counsel for the Trust did not correct the Court's understanding of its position. Following the hearing, the Court entered a minute order [215] granting LINA's motion to supplement [210], and giving the Trust until December 3, 2009 to file a response to the additional statements of material fact. Plainly, the Trust never sought leave to file a surreply regarding LINA's motion for summary judgment. While the Court does not condone the Trust's failure to obtain leave to file the surreply, it notes that LINA asserts new arguments in its reply brief. For example, LINA argues for the first time in reply that delivery was not required for the policies to go into effect. Therefore, to avoid prejudice to the Trust, the Court will consider the surreply. LINA's motion to strike [221] is denied and leave to file the surreply is granted *sua sponte*.

# I.    Background

The Court takes the relevant facts primarily from the parties' Local Rule ("L.R.") 56.1 statements[4]: Defendant's Statement of Facts ("Def. SOF") [198], Plaintiff's Response to Defendant's Statement of Facts and Statement of Additional Material Facts ("Pl. Resp.") [202], Defendants' Response to Plaintiff's Statement of Additional Material Facts ("Def. Resp.") [211], Supplement to Defendant's Statement of Material Facts ("Def. Supp. SOF") [216], Plaintiff's Response to Supplement to Defendant's Statement of Material Facts ("Pl. Supp. Resp.") [218], and Defendant's Response to Plaintiff's Supplemental Statement of Additional Material Facts ("Def. Supp. Resp.") [220].

Plaintiff is a trust that was jointly established by the National Production Workers Union ("the Union") and certain employers that have entered into collective bargaining agreements with the Union. Def. SOF ¶ 1. The Trust provides health and welfare benefits to members of the Union and their dependents. Def. SOF ¶ 2. Between 2001 and the end of 2005, Robert Mondo, Jr. and his firm, Executive Fidelity, Ltd., served as an insurance broker for the Trust. Def. SOF ¶

---

[4] L.R. 56.1 requires that statements of facts contain allegations of material fact and that factual allegations be supported by admissible record evidence. See L.R. 56.1; *Malec v. Sanford,* 191 F.R.D. 581, 583-85 (N.D. Ill. 2000). The Seventh Circuit repeatedly has confirmed that a district court has broad discretion to require strict compliance with L.R. 56.1. See, *e.g., Koszola v. Bd. of Educ. of the City of Chicago,* 385 F.3d 1104, 1109 (7th Cir. 2004); *Curran v. Kwon,* 153 F.3d 481, 486 (7th Cir. 1998) (citing *Midwest Imports, Ltd. v. Coval,* 71 F.3d 1311, 1317 (7th Cir. 1995) (collecting cases)). Where a party has offered a legal conclusion or a statement of fact without offering proper evidentiary support, the Court will not consider that statement. See, *e.g., Malec,* 191 F.R.D. at 583. Additionally, where a party improperly denies a statement of fact by failing to provide adequate or proper record support for the denial, the Court deems that statement of fact to be admitted. See L.R. 56.1(a), 56.1(b)(3)(B); see also *Malec,* 191 F.R.D. at 584. The requirements for a response under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted." *Bordelon v. Chicago Sch. Reform Bd. of Trs.,* 233 F.3d 524, 528 (7th Cir. 2000). In addition, the Court disregards any additional statements of fact contained in a party's response brief but not in its L.R. 56.1(b)(3)(B) statement of additional facts. See, *e.g., Malec,* 191 F.R.D. at 584 (citing *Midwest Imports,* 71 F.3d at 1317). Similarly, the Court disregards a denial that, although supported by admissible record evidence, does more than negate its opponent's fact statement—that is, it is improper for a party to smuggle new facts into its response to a party's L.R. 56.1 statement of fact. See, *e.g., Ciomber v. Cooperative Plus, Inc.,* 527 F.3d 635, 643 (7th Cir. 2008).

11. As the Trust's broker, Mondo obtained quotes on insurance policies for the Trust. Def. SOF ¶ 11. Mondo was independent of all insurance companies, including Defendant LINA. Def. SOF ¶ 14. Mondo had not had any dealings with LINA prior to obtaining the policies at issue in this case from LINA on the Trust's behalf. Def. SOF ¶ 14.

In August of 2003, the Trust decided to obtain life insurance and accidental death and dismemberment ("AD&D") insurance for Union members. Pl. Resp. ¶ 44. To that end, on August 13, 2003, Mondo e-mailed a request for proposals ("RFP") to various insurance companies at the direction of Union officer Anthony Monaco and on behalf of the Trust. Def. SOF ¶¶ 15-16. The RFP sought proposals for providing Union members with $100,000 in group life coverage and $100,000 in AD&D coverage, and stated that "The NPWU Insurance Benefit Trust is the owner of the policy and also the beneficiary." Def. SOF ¶ 15. The RFP further stated that "[y]our normal life and AD&D contract will suffice." Ex. 2 to Def. SOF at 2913.

Defendant LINA is a corporation that provides life, accident, and disability insurance to "employee welfare benefit plans," as that term is defined by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1002(1). Def. SOF ¶ 3. John Tuerk, an employee of one of LINA's affiliates, was among the recipients of the RFP. Def. SOF ¶ 18. On August 27, 2003, Tuerk e-mailed Mondo LINA's proposal, which called for $100,000 in group life and AD&D coverage for actively employed Union members, with premium rates of $0.25 per $1,000 in life coverage and $0.025 per $1,000 in AD&D coverage. Def. SOF ¶ 18. The proposal stated that "CIGNA Group Insurance contract language will be used." Def. SOF ¶ 18. LINA's proposal contained a disclaimer under the heading "This is not a contract," which stated:

> This proposal outlines in general some of the important features of the proposed group insurance program. The controlling provisions will be in the group insurance policy, and this proposal is not intended in any way to modify the provisions or their meanings.

Def. SOF ¶ 18. The proposal made no mention of the designation of beneficiaries. Ex. 2 to Def. SOF at 1858-62.

Mondo told Tuerk that the Trust was interested in LINA's proposal. Def. SOF ¶ 19. According to Mondo, he told Tuerk on at least two occasions prior to the issuance of the policies that the Trust was going to be the beneficiary, and that Tuerk told him that was not going to be a problem. Pl. Resp. ¶¶ 47, 49; Mondo Dep., pp. 91-96.

On September 9, 2003, LINA's Implementation Coordinator, Mary Ellen Rapp, e-mailed Mondo documents that LINA would use to issue final versions of the insurance policies. Def. SOF ¶ 19. The documents attached to Rapp's e-mail included drafts of the AD&D policy and group life policy, an application for group insurance, a subscription agreement, a subscription and joinder agreement, and a chart describing the purpose of the attachments and the action that the Trust was requested to take. Def. SOF ¶¶ 20-21; Ex. 2 to Def. SOF at 2534 (Rapp e-mail), 1552 (chart), 1561-77 (draft life policy), 1588-1606 (draft AD&D policy). The chart identifies the "Action Required" as to the draft policies as "Please review and provide corrections where applicable."[5] Def. SOF ¶ 21.

Neither of the draft policies specifically designated the Trust as a beneficiary of the coverage. Def. SOF ¶ 23. The draft AD&D policy provided that "[t]he beneficiary is the person or persons the Employee names or changes on a form executed by him and satisfactory to Us." Def. SOF ¶ 23. The draft life insurance policy provided that "Death Benefits will be paid to the Insured's named beneficiary, if any, on file at the time of payment. If there is no named

---

[5] The Trust responds that "the identity and date of the email" to which the chart was attached "are uncertain." Pl. Resp. ¶ 21. It is not clear to the Court whether the Trust intends to deny that the chart, or any of the other documents, were attached to the September 9, 2003 e-mail. In any event, the Trust fails to provide any evidentiary support for such a denial. Because the Trust has not provided adequate record support for a denial, the Court deems admitted the fact that the chart, draft policies, and other materials were attached to Rapp's September 9, 2003 e-mail to Mondo. See L.R. 56.1(a), 56.1(b)(3)(B); *Malec,* 191 F.R.D. at 584.

beneficiary or surviving beneficiary, Death Benefits will be paid to the first surviving class of the following living relatives: spouse; child or children; mother or father." Def. SOF ¶ 24. The draft life insurance policy further provided that "[t]he Insured may change the Beneficiary at any time by giving written notice to the Employer or the Insurance Company." Def. SOF ¶ 24. On September 16, 2003, Rapp asked Mondo about his review of the draft policies, and he told her that "everything was fine." Def. SOF ¶ 22. The Trust denies receiving copies of the draft policies. Pl. Resp. ¶ 55.

The chart attached to Rapp's e-mail requested that a management representative of the Trust sign the group insurance application and the subscription agreements. Def. SOF ¶ 25. Louis M. Pissios, the Trust's chairman, acting with full authority to bind the Trust, signed the group insurance application and subscription agreements. Def. SOF ¶ 25. The application for group insurance stated that: "Payment of the required premium after delivery of the policy(ies) acts as acceptance of the terms and conditions of the policy(ies)." Def. SOF ¶ 26.

In a September 25, 2003 e-mail, Rapp informed Mondo that she had received the Trust's premium payment. Def. SOF ¶ 27. Rapp stated that LINA would furnish the final policies to Mondo when she received a second set of the signed subscription agreements and the trust agreement from the Trust. Def. SOF ¶ 27. On November 12, 2003, Rapp sent Mondo final versions of the policies and insurance certificates. Def. SOF ¶ 28. The beneficiary provisions in the final policies were identical to the beneficiary provisions, quoted above, in the draft policies. Def. SOF ¶ 29. The final policies did not designate the Trust as a beneficiary of the coverage. At his deposition, Mondo acknowledged receiving the final version of the policies, and stated that he believes he forwarded the policies to the Trust. Mondo Dep. at 77-78. The Trust denies that it ever received copies of the final insurance policies. Pl. Resp. ¶ 56. The Trust made

premium payments to LINA from September 2003 to May 2004, without objecting to the policies' terms. Def. SOF ¶ 30.

On December 2, 2003, the trustees of the Trust held a meeting at which they voted to name the Trust as 50% beneficiary and the Union members as 50% beneficiary on the group life policy. Def. SOF ¶ 32; Ex. 7 to Def. SOF.

On May 21, 2004, Mondo sent LINA an e-mail stating that a Union member, Charles C. Knight, had died. Def. SOF ¶ 33. In a May 27, 2004 e-mail, Mondo demanded that the Trust receive half of Knight's death benefit, with the Knight's beneficiary receiving the other half. Def. SOF ¶ 33. Mary Margaret Murphy, the Trust's Rule 30(b)(6) representative, stated in her deposition that until Knight's death the Trust thought that the life insurance beneficiary provision provided for the Trust to receive half of any member's death benefit. Pl. Resp. ¶ 34; Murphy Dep. 88.

On June 8, 2004, LINA informed Mondo by e-mail that, under the terms of the life policy, the death benefit had to be paid to the beneficiary chosen by the insured Union member, and that the death benefit could not be paid to the Trust unless the Union member designated the Trust as the beneficiary. Def. SOF ¶ 35. In that e-mail, LINA noted that Illinois law required that proceeds be paid to the beneficiary designated by the insured person. Ex. 2 to Def. SOF at 2166. The e-mail further stated that "if [the employees] sign off on the trust as a beneficiary this is ok." *Id.*

In Knight's case, the decedent had not named a beneficiary. Def. SOF ¶ 36. The policy provided that where there is no named beneficiary, the death benefits will be paid to "the first surviving class of the following living relatives: spouse; child or children; mother or father." Knight was a widower. Def. SOF ¶ 36. On August 4, 2004, consistent with the terms of the

policy, LINA paid Knight's sons a total of $100,974.60 (the death benefit with interest). Def. SOF ¶ 36.

By letter dated August 18, 2004, LINA's counsel, Walter Heindl, informed Mondo that due to the dispute between the Trust and LINA regarding the beneficiary provisions, the Trust's policies would be terminated effective September 30, 2004. Def. SOF ¶ 38. The letter stated, in part, as follows:

> I have been made aware that the initial request for proposal (sent through our health care organization) contained the following specification: "The NPWU Insurance Benefit Trust is the owner of the policy and also the beneficiary." However, it does not appear that there were any further discussions concerning this unusual feature until after the group life policy was issued. On the contrary, the proposal delivered by LINA indicated that coverage would be provided under the terms of LINA's standard group life policy forms, and made no mention of this requested provision. Surely you will appreciate that the requested beneficiary structure is both non-standard and unusual. While we regret that it may not have been explicitly pointed out the ways in which the proposed contract differed from the what had been originally requested, we also believe that NPWU shares responsibility for failing to recognize that the contract which LINA proposed and thereafter issued to it didn't conform to the unusual structure requested.
>
> In any event, it is obvious that there has not been a meeting of the minds regarding the design of the group life insurance plan, and the group life insurance policy which LINA has issued is quite apparently not what the NPWU Trust desires. Since LINA is legally precluded from issuing the sort of policy which the NPWU Trust evidently seeks, LINA hereby exercises its right to terminate the group policy, effective September 30, 2004. * * * All claims incurred prior to the effective date of termination will be paid according to the terms of the contract as issued.

Def. SOF ¶ 38. LINA billed the Trust for the August and September 2004 premiums, but the Trust refused to pay the premiums, which total $75,295.00. Def. SOF ¶¶ 42-43.

According to Mondo, contrary to Heindl's statement that "LINA is legally precluded from issuing the sort of policy which the NPWU Trust evidently seeks," Tuerk had assured him that having the Trust as the beneficiary of the policy would not be a problem. Pl. Resp. ¶¶ 47, 49; Mondo Dep., pp. 91-96.

Mondo entered into a commission agreement with LINA. Def. Supp. SOF ¶ 1. The commission agreement between LINA and Mondo provided that Mondo had no authority to bind LINA to any risk, to issue or countersign policies, to waive or modify policy terms, to collect premiums (other than an initial binder check), to underwrite or accept applications for insurance, or to adjust or settle claims. Def. Supp. SOF ¶ 1. The agreement provided that Mondo would be "deemed to be acting as the agent of the Policyholder and not as the agent of" LINA in any dispute between LINA and a policyholder or insured. Def. Supp. SOF ¶ 2.

## II.    Legal Standard on Summary Judgment

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The non-moving party "must do more than simply show that there is some

metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

## III.    Analysis

### A.    ERISA Preemption

LINA contends that all of the Trust's claims are completely preempted by ERISA. Before addressing LINA's contention, it is important to distinguish between two types of so-called preemption that can occur under ERISA: conflict preemption and complete preemption. See *Rice v. Panchal*, 65 F.3d 637, 640 (7th Cir. 1995); *Administrative Committee of Wal-Mart Stores, Inc. Associates' Health and Welfare Plan v. Varco*, 338 F.3d 680, 689 n.5 (7th Cir. 2003). Conflict preemption arises under ERISA § 514(a) and serves as a defense to preempted state law actions. *Rice*, 65 F.3d at 639-40.

Despite its inapt name, the doctrine of complete preemption is not a preemption doctrine at all; rather, it is a federal jurisdiction doctrine. *Lister v. Stark*, 890 F.2d 941, 944 n.1 (7th Cir. 1989); see also *Lehmann v. Brown*, 230 F.3d 916, 919 (7th Cir. 2000) ("'complete preemption' is a misnomer, having nothing to do with preemption and everything to do with federal occupation of a field"). Complete preemption "confers exclusive federal jurisdiction in certain instances where Congress intended the scope of a federal law to be so broad as to entirely replace any state-law claim." *Franciscan Skemp Healthcare, Inc. v. Central States Joint Board Health and Welfare Trust Fund*, 538 F.3d 594, 596 (7th Cir. 2008). In the context of ERISA, § 502(a) – ERISA's civil enforcement provision – provides the basis for complete preemption. *Id.* The Supreme Court has held that ERISA § 502(a) has "such 'extraordinary pre-emptive power' that it

'converts an ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'" *Aetna Health Inc. v. Davila,* 542 U.S. 200, 209 (2004) (quoting *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 65-66 (1987)). Therefore, causes of action that are within the scope of the civil enforcement provisions of § 502(a) are completely preempted, and are removable to federal court. *Klassy v. Physicians Plus Ins. Co.*, 371 F.3d 952, 954 (7th Cir. 2004).

Here, the parties engage in what, ultimately, is an academic debate regarding whether the Trust's state law claims fall within the scope of ERISA § 502(a)(3) such that they are completely preempted. The conclusion that the Trust's claims are completely preempted would have two implications. First, complete preemption would provide a basis for removal based on federal-question jurisdiction. Second, the Trust's state law claims would be recharacterized as federal claims arising under ERISA, and the Court would construe them "in accordance with federal common law * * * and general rules of contract interpretation." *Grun v. Pneumo Abex Corp.*, 163 F.3d 411, 419 (7th Cir. 1998). See also *Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir. 1992) (where state law claims are preempted, district court should determine whether the complaint sufficiently alleged facts and conclusions to plead an ERISA claim); *McDonald v. Household Intern., Inc.*, 425 F.3d 424 (7th Cir. 2005) (same). Each of these implications is irrelevant to the outcome of this case, and therefore the Court need not decide whether the Trust's claims are completely preempted by ERISA. See *Steele v. Life Ins. Co. of North America*, 507 F.3d 593 (7th Cir. 2007).

The Court has diversity jurisdiction over this action. 28 U.S.C. § 1332. Given the existence of that alternative basis for jurisdiction, there is no need to decide whether the Court also has federal question jurisdiction because the Trust's claims arise under ERISA § 502(a).

Moreover, the Court will apply the same general principles of contract law to resolve this case regardless of whether the Trust's claims are completely preempted. In particular, if the claims are not completely preempted, Illinois law applies. See *Allstate Ins. Co. v. Menards, Inc.,* 285 F.3d 630, 634 (7th Cir. 2002) (a district court sitting in diversity must apply the law of the state in which it sits). If the claims are completely preempted, federal common law applies. *Bullwinkel v. New England Mut. Life Ins. Co.,* 18 F.3d 429, 431 (7th Cir. 1994) (where ERISA governs, courts "apply federal common law rules of contract interpretation"). However, as LINA notes, in fashioning federal common law, courts look to the contract law of Illinois, the forum state. *Id.* (noting that "Federal common law rules of contract interpretation parallel equivalent state rules"). Therefore, "the [same] general principles of contract law [apply] * * * regardless [of] whether Illinois law or federal common law applies." *Salomon v. LECG, LLC*, 2009 WL 3060271, at *3 (N.D. Ill. Sept. 21, 2009); see also *Steele*, 507 F.3d at 596 n.1 (noting that outcome of case involving insurance policy possibly governed by ERISA would be the same under Illinois law and federal common law). Indeed, the parties agree that Illinois law governs; they merely debate whether it applies as a matter of federal common law, as LINA contends, or as a matter of state law, as the Trust claims.

In sum, whether the Court "treat[s] this as a federal-question ERISA matter or a contract case grounded in diversity is irrelevant" because the Court's jurisdiction is not in question and – as the parties agree – principles of Illinois contract law apply. *Steele*, 507 F.3d at 596. Therefore, the Court will proceed to the merits of the Trust's claims under Illinois law without engaging in a lengthy, and ultimately meaningless, complete preemption analysis.[6]

---

[6] The Seventh Circuit took the identical approach in *Steele*, which, like the instant case, involved an insurance policy issued by CIGNA and underwritten by LINA. 507 F.3d at 594. In *Steele*, LINA removed the plaintiff's state law case based on diversity and federal question jurisdiction, based on the argument that the policy was governed by ERISA. *Id.* at 595. The Seventh Circuit declined to decide

**B.      Counts I and II – Declaratory Judgment and Rescission**

In Count I of the complaint, the Trust seeks a declaration that no valid insurance policies ever existed between the parties because there was no meeting of the minds with respect to the beneficiary provisions.  Count II, a common law rescission claim, likewise alleges that there was no meeting of the minds with respect to the policies, and seeks rescission on that ground.  In its motion, LINA contends that there was a "meeting of the minds" as a matter of law, such that it is entitled to summary judgment in its favor on Counts I and II.

The general rules governing contract interpretation apply to insurance policies. *United National Ins. Co. v. Fasteel, Inc.*, 550 F. Supp. 2d 814, 821 (N.D. Ill. 2008).  "[U]nder Illinois law, when the basic facts are not in dispute, the existence of a contract is a question of law." *Echo, Inc. v. Whitson Co.,* 121 F.3d 1099, 1102 (7th Cir. 1997).  Therefore, issues of contract formation often are well-suited for disposition on summary judgment. *Id.*

The requirements for a valid contract are an offer, acceptance, and consideration. *Franck v. Farmers New World Life Ins. Co.,* 445 F. Supp. 2d 954, 961 (N.D. Ill. 2006).  The formation of a binding contract also requires mutual assent – often referred to as a "meeting of the minds" – as to the essential terms of the contract. *Id.*  The parties' failure to agree upon or even discuss an essential term of a contract may indicate that the mutual assent required to make a contract is lacking, such that there is no enforceable contract.  See *Rose v. Mavrakis*, 799 N.E.2d 469, 473 (Ill. App. Ct. 1st Dist. 2003).  Here, the dispute centers on whether there was a meeting of the minds regarding the beneficiary provisions.

The "meeting of the minds" metaphor should not be interpreted literally.  See *Laserage Technology Corp. v. Laserage Laboratories, Inc.*, 972 F.2d 799, 802 (7th Cir. 1992); *Wells*

---

whether the policy was governed by ERISA, reasoning that it was "irrelevant," as the Court had diversity jurisdiction and the same standard of review and principles of contract law applied in either case. *Id.* at 596.

*Fargo Funding v. Draper & Kramer Mortg. Corp.*, 608 F. Supp. 2d 981, 985 (N.D. Ill. 2009). Illinois law does not require that "the parties share a subjective understanding as to the terms of the contract." *Jannusch v. Naffziger*, 883 N.E.2d 711, 716 (Ill. App. Ct. 4th Dist. 2008); see also *Wells Fargo*, 608 F. Supp. 2d at 985. Rather, Illinois courts apply an objective theory of intent to determine whether there has been a "meeting of the minds." *Laserage*, 972 F.2d at 802. Therefore, the inquiry focuses on what the parties expressed to each other, both in writing and by their conduct, not on the parties' "actual mental processes." *Id.*; see also *Wells Fargo*, 608 F. Supp. 2d at 985 (focus is on the parties' "external signs" and "outward expression[s] of assent") (citations omitted); *Jannusch*, 883 N.E.2d at 716 (parties' "conduct may indicate an agreement to the terms" of an agreement). The Illinois Supreme Court has explained that conduct alone may indicate an agreement to the terms of a contract because, "[o]therwise, a party would be free to avoid his contractual liabilities by simply denying that which his course of conduct indicates." *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 515 N.E.2d 61, 65 (Ill. 1987). "Where it appears that the language used or the terms proposed are understood differently by the parties, there is no meeting of the minds and no contract exists between the parties." *Vandevier v. Mulay Plastics, Inc.*, 482 N.E.2d 377, 381 (Ill. App. Ct. 1st Dist. 1985).

As an initial matter, the Court notes that, contrary to the Trust's suggestion, Heindl's statement that "there has not been a meeting of the minds regarding the design of the group life insurance plan" is not dispositive as to whether there was mutual assent as a matter of law. The letter stated that LINA was exercising its right to terminate the policies, which indicates that Heindl neither believed, nor intended to suggest, that the policies were not valid contracts. Moreover, in any event, the existence of a contract is a question of law for the Court to decide.

LINA argues that summary judgment should be granted as to the Trust's declaratory

judgment and rescission claims because all elements of a valid contract exist. In particular, LINA contends that it offered to provide the coverage described in the policies by sending the draft and final policies to Mondo, and that the Trust accepted that offer by retaining the policies without objection and paying the premiums for nine months. The Trust responds that no valid contract was formed because LINA failed to provide it with the policy described in the RFP. In the RFP, the Trust requested a policy on which it was the beneficiary. The policies that LINA issued to the Trust provided that the beneficiary would be the person named by the individual insured. The Trust contends that this discrepancy between the policy that it requested and the policies that it received indicates that there was no meeting of the minds and renders the policies unenforceable.

Illinois law imposes a duty on an insured to review the terms of an insurance policy issued to him and to know the contents of that policy. See *Golf v. Henderson*, 876 N.E.2d 105, 111 (Ill. App. Ct. 1st Dist. 2007); *Commonwealth Ins. Co. v. Stone Container Corp.*, 351 F.3d 774, 780 (7th Cir. 2003). An insured also is obligated to inform the insurer of any discrepancies between the policy received and the policy requested. *Jacobs v. Paul Revere Life Ins. Co.*, 2004 WL 3119012, at *6 (N.D. Ill. Dec. 17, 2004). In view of these duties, "Illinois courts have repeatedly held that when an insured sues his or her insurer after failing to note a discrepancy between the policy issued and received and the policy requested or expected, the insured will be bound by the contract terms." *Perelman v. Fisher*, 700 N.E.2d 189, 192 (Ill. App. Ct. 1st Dist. 1998).

For example, in *Jacobson v. Mutual Life Ins. Co. of N.Y.*, 271 F.2d 620, 621 (7th Cir. 1959), the plaintiff executed an application for an insurance policy with the defendant insurance company requesting, among other things, level disability benefits. The insurance company

issued a policy that did not provide for level disability benefits. *Id.* The plaintiff, having failed to read the policy and note the inconsistency with his application, paid premiums for twenty-one years. *Id.* at 622. When the plaintiff discovered the discrepancy between the application and the policy, he sued the insurer, claiming that the policy should be construed as providing all of the coverage requested in the application. *Id.* The court rejected the plaintiff's contention, reasoning that because the policy varied from the application, it constituted a counteroffer, which the plaintiff had accepted by paying premiums for twenty-one years. *Id.*

Likewise, here, the policies that LINA issued differed from the policy requested in the RFP, such that the policies constituted either an offer or a counteroffer.[7] Consequently, in the usual case, the Trust would be deemed to have accepted the policies by paying the premiums without objection, and would be bound to the terms of the policies.

However, the Trust contends that this is not the usual case because it never received copies of either the draft policies or the final policies.[8] Therefore, according to the Trust, it was in no position to accept or reject the terms of the policies, and cannot be held to their terms. LINA responds that the Trust is bound by the policies, regardless of whether it received copies of them, for four reasons: (1) delivery was not required for the policies to take effect; (2) even if delivery was required, under the doctrine of constructive delivery, delivery of the policies to

---

[7] Generally, RFPs are considered invitations to negotiate, not offers. Indeed, as discussed below, the RFP in this case was not a valid offer under Illinois contract law; therefore, the policies were the initial offer. But even if the RFP were considered to be an offer, the policies issued constituted a counteroffer because they did not strictly comply with the RFP. See *Zeller v. First Nat'l Bank & Tr. Co.,* 398 N.E.2d 148, 150 (Ill. App. Ct. 1st Dist. 1979) (holding that an acceptance which does not "comply strictly with the terms of the offer" and instead modifies its terms "constitutes a rejection of the original offer, and becomes a counterproposal which must be accepted by the original offeror before a valid contract is formed").

[8] There is some evidence in the record suggesting that the Trust was provided copies of the policies. For example, Mondo testified that he forwarded the final policies to the Trust. Mondo Dep. at 77-78. However, in view of its obligation to draw all reasonable inferences in the Trust's favor at this stage of the case, the Court must assume for purposes of LINA's motion for summary judgment that the Trust never received copies of the policies.

Mondo constituted delivery to the Trust; (3) Mondo's knowledge of the policies' terms is imputed to the Trust; and (4) the Trust had access to the policies, and therefore can be charged with knowledge of the policies' terms. The Court will address each of LINA's arguments in turn.

### 1.     Whether Delivery Was Required

LINA contends that whether the Trust received the policies is irrelevant because the policies did not expressly require actual physical delivery to the insured, and therefore they took effect upon issuance by LINA. LINA is correct that the policies at issue did not expressly require delivery.[9] And it is true that, as a rule, "if all the terms have been agreed upon between the parties, the formal delivery of the policy by the insurer and its acceptance by the insured are not essential to its validity." *Stramaglia v. Conservative Life Ins. Co. of Wheeling, West Virginia*, 48 N.E.2d 719, 722 (Ill. App. Ct. 1st Dist. 1943). However, it is equally true that "if the terms have not been agreed upon, * * * the contract of insurance will not become binding" immediately upon being issued. *Id.*; see also *Franck v. Farmers New World Life Ins. Co.*, 445 F. Supp. 2d 954, 962 (N.D. Ill. 2006). Rather, the terms of the policy must be accepted by the insured before a binding contract is formed. Here, LINA's own theory of the case is that the policies constituted offers. In fact, LINA in effect concedes that the terms of the policies had not been agreed upon at the time LINA sent the policies to Mondo. Therefore, in this case, the policies did not go into effect upon being issued by LINA. See *Franck*, 445 F. Supp. 2d at 962

---

[9] The Trust argues that the policies did require delivery before they could go into effect. For that position, the Trust relies on the following statement in the subscription agreement: "payment of the required premium after delivery of the policy(ies) acts as acceptance of the terms and conditions of the policy(ies)." Contrary to the Trust's contention, the quoted language does not compel the conclusion that delivery was required before the policies could be effective. Rather, it merely sets forth one way in which the policies could be accepted. Moreover, each policy provides that it goes into effect at 12:01 AM on September 1, 2003. See LINA 2654, 2714. Therefore, the policies did not expressly required delivery.

(where parties had not agreed on a premium rate, the policy did not go into effect upon issuance). Rather, a manifestation of acceptance by the Trust was required.

### 2. Constructive Delivery

According to LINA, even if a delivery requirement existed in this case, it was satisfied by the undisputed delivery of the policies to Mondo, who LINA contends was the Trust's agent. The Trust responds that Mondo was not acting as its agent at the time he received the policies. But even assuming that Mondo was the Trust's agent at the pertinent time, the doctrine of constructive delivery is inapplicable under the facts of this case.

The doctrine of constructive delivery provides that the unconditional delivery of an insurance policy to the insured's agent constitutes delivery to the insured. See 43 Couch on Insurance (3d Ed.) § 14:15; Am. Jur. 2d Insurance § 243 (2010). Because unconditional delivery is required, the doctrine does not apply where the insured's agent is "under instructions to turn over the policy to the insured only after compliance with certain conditions." *Mass. Mut. Life Ins. Co. v. O'Brien*, 5 F.3d 1117, 1123 (7th Cir. 1993) (no constructive delivery where "the policy had to be 'delivered to the person named as owner therein,' and all statements made in the application which related to the insurability of the applicant had to be 'complete and true as though they were made at [the] time' of delivery and payment"); see also *Franck*, 445 F. Supp. 2d at 963 (no constructive delivery where insurer sent the policy to the agent "with instructions to have [the insured] sign the policy acceptance form and the illustration and pay an additional premium"). Where the constructive delivery doctrine does apply, the policy becomes effective and binding on the parties upon delivery to the agent. See *Rose v. Mutual Life Ins. Co. of New York*, 240 Ill. 45, 51, 88 N.E. 204 (Ill. 1909) ("the rule is that a policy becomes binding on the insurer when signed and forwarded to the insurance broker to whom the application for insurance

was made, to be delivered to the insured"); *Franck*, 445 F. Supp. 2d at 963 (where constructive delivery is permitted, delivery to agent renders policy effective).

The Illinois Supreme Court articulated the reasoning behind the constructive delivery doctrine in *Rose* as follows:

> "Where an application is made for insurance, there is no liability until the application is accepted, but the acceptance and issuing of the policy [by the insurer] completes the contract. An unqualified acceptance of the application and placing the completed policy in the hands of an agent for delivery, without condition, completes the contract. To hold that an insurance policy is not in effect until the date of its delivery, contrary to its own terms, and where there is no agreement of that kind, would throw every case of insurance into doubt and uncertainty by leaving the term to depend upon oral testimony."

240 Ill. at 51-52 (citation omitted). In other words, constructive delivery is permitted where the elements of a valid contract – including offer, acceptance, and mutual assent – have been satisfied. Accordingly, the doctrine does not apply where acceptance of the policy by the insured is required to complete the contract, either because the policy is an offer, or because it differs form the insured's application such that it is a counteroffer. See 1A Couch on Ins. § 14:11 (2009) (doctrine does not apply "where an acceptance of the policy by the insured is required to complete the contract," including where the "policy materially differs from the one for which the applicant applied, and the latter has not approved the changes"); 16 Williston on Contracts § 49:62 (4th ed.) (2009) (where "the policy is actually an offer by the company to the applicant, [] no constructive delivery to or acceptance by the applicant will be presumed"); *Argonaut Ins. Co. v. Industrial Acc. Commission*, 190 Cal.App.2d 392, 398-99 (Cal. App. Ct. 1961) ("[w]here the policy sent to the agent of the insurer differs from the one applied for * * * the delivery is not affected by mailing it to the agent"); *Morford v. California Western States Life Ins. Co.*, 113 P.2d 629, 636 (Or. 1941) ("where the contract is different from that applied for, * * * delivery is not automatic upon sending it to the agent").

As discussed above, here, LINA's own position is that the policies constituted offers or counteroffers. Therefore, the doctrine of constructive delivery is not applicable because, when the policies were delivered to Mondo, the Trust's acceptance was required before they could become binding. See 44 C.J.S. Insurance § 501 (2009) (constructive delivery applies where no "further action on the part of the insured [is] necessary except the mere formal act of receiving the policy").

### 3. Whether the Trust Is Charged with Knowledge of the Policies' Terms

Finally, LINA asserts two arguments for why the Trust should be charged with knowledge of the policies' terms, even assuming it never received copies of the policies. First, LINA argues that Mondo was the Trust's agent, and therefore his knowledge of the policies' terms can be imputed to the Trust. Second, LINA contends that even if Mondo was not the Trust's agent, the Trust can be charged with knowledge of the policies' terms because it could have requested a copy of the policies from LINA or Mondo.

With respect the LINA's first contention, it is a well-established principle of agency law that an agent's knowledge is imputed to the principal. See *Lease Resolution Corp. v. Larney*, 719 N.E.2d 165, 170 (Ill. App. Ct. 1st Dist. 1999) ("[g]enerally, an agent's knowledge is imputed to the principal"). That rule applies in the context of insurance, such that an insured is charged with his broker's knowledge even if that knowledge was not specifically communicated to him by the agent. See *Western Fire Ins. Co. v. Moss*, 298 N.E.2d 304, 310-11 (Ill. App. Ct. 1st Dist. 1973); *Dreiling v. Maciuszek*, 780 F.Supp. 535, 541 (N.D. Ill. 1991); *Pekin Life Ins. Co. v. Schmid Family Irrevocable Trust*, 834 N.E.2d 531, 537 (Ill. App. Ct. 1st Dist. 2005). Here, the Court finds, as a matter of law, that Mondo was acting as a broker and the Trust's agent, not as LINA's agent, and thus any knowledge that Mondo may have had is imputed to the Trust.

"Although the question whether an insurance broker is the agent of the insured or the

insurer is generally one of fact, when the evidence clearly shows that the broker is the agent of the insured, it becomes a matter of law." *Lazzara v. Howard A. Esser, Inc.,* 802 F.2d 260, 264 (7th Cir. 1986).  Illinois courts distinguish between insurance brokers, who generally act as agents of insureds, insurance agents, who generally act on behalf of insurers.  *Founders Ins. Co. v. White*, 3856 N.E.2d 506, 510 (Ill. App. Ct. 1st Dist. 2006).  Illinois courts have defined an insurance broker as:

> [O]ne who procures insurance and acts as middleman between the insured and the insurer, and solicits insurance business from the public under no employment from any special company, but, having secured an order, places the insurance with the company selected by the insured, or, in the absence of any selection by him, with the company selected by such broker.

*Galiher v. Spates,* 262 N.E.2d 626, 628 (4th Dist. 1970); see also *Lazzara,* 802 F.2d at 264.  By contrast, an insurance agent "has an exclusive, fixed, and permanent relationship to an insurance company that the agent represents and has certain duties and allegiances to that company." *Lazzara*, 802 F.2d at 264.  To determine whether an individual acted as a broker or an agent, Illinois courts consider four factors: (1) who first set the individual in motion; (2) who controlled the individual's action; (3) who paid the individual; and (4) whose interests the individual was protecting.  *Founders Ins. Co.*, 3856 N.E.2d at 510.

Here, the undisputed facts clearly show that Mondo was an insurance broker acting as the Trust's agent.  The Trust set Mondo in motion by authorizing him to send the RFP to multiple insurance providers.  Mondo was independent of all insurance companies, and had not previously dealt with LINA.  He was under no obligation to obtain coverage from any particular company.  The Trust controlled Mondo by instructing him to procure the policy from LINA after considering the responses to the RFP.  Mondo Dep. at 53.  While Mondo entered a commission relationship with LINA, the question of who pays the commission is given "very little weight"

under Illinois law, and is not enough to establish that Mondo was an agent of LINA. *Royal Maccabees Life Ins. Co. v. Malachinski*, 161 F. Supp. 2d 847, 852 n.2 (N.D. Ill. 2001); see also *Mizuho Corp. Bank (USA) v. Cory & Associates, Inc.*, 341 F.3d 644, 654 (7th Cir. 2003) (payment of commission by insurer "is not enough standing alone to establish an agency relationship").

The Trust contends that even if Mondo was its agent for purposes of procuring the insurance, he had ceased being its agent and had became LINA's agent when LINA sent Mondo the policies. While "an insurance broker typically represents the insured, the broker may also become the agent of the insurer or both parties." *United States v. Segal*, 495 F.3d 826, 836 (7th Cir. 2007) (citation omitted). "Whether an entity is an agent of the company or the insured is determined by its actions." *Id.* In an effort to establish that Mondo was an agent of LINA, the Trust points to the fact that LINA paid Mondo, as well as to a letter from LINA to Mondo expressing an interest in partnering with Mondo with respect to the Trust's account. As noted above, the question of who paid the broker is given little weight; therefore, it does not compel the conclusion that Mondo became LINA's agent. And the letter discusses only the implementation of the Trust's insurance policies, and does not suggest any relationship between Mondo and LINA outside the context of the Trust's account. Moreover, while Mondo was the Trust's agent only for the limited purpose of procuring insurance coverage, Illinois courts have indicated that the limited agency of an insurance broker extends at least through the delivery of the policy. See *Roby v. Decatur Steel Erectors, Inc.*, 375 N.E.2d 1355 (Ill. App. Ct. 4th Dist. 1978) ("a broker is a special agent with authority to obtain or procure a policy of insurance and deliver it to the insured, and it has been held that any actions after delivery of the policy are beyond the scope or perimeter of the agent's authority and are, consequently, not binding on the

principal insured, unless ratified").  Therefore, the Court finds that Mondo was acting as the Trust's agent at the time that he received the policies, and therefore any knowledge that he had can be imputed to the Trust.

Although the parties appear to assume that Mondo had actual knowledge of the terms of the policies, LINA does not point to any evidence tending to establish that Mondo read the policies or otherwise obtained actual knowledge of their terms, including the beneficiary provisions.  However, courts have held that an insured can be charged with knowledge of facts that their broker "should have known."  See *Pekin*, 834 N.E.2d at 537; 3 Couch on Ins. § 46:21 ("insured is also charged with knowledge of facts which though not actually known to the agent were such that the agent should have known them").  For example, in *Pekin*, whether the policy became a binding contract turned on whether the insured knew that the insurer refused to accept payment of the initial premium by automatic withdrawal.  The insured's broker denied knowing the initial premium could not be paid by automatic withdrawal.  834 N.E.2d at 537.  However, the broker admitted that the rule was stated in a manual that his employer kept at its offices, and that he had processed over 100 applications for insurance policies with the insurer during his career, and had always submitted a check or cash to cover the initial premium.  *Id.*  From those facts, the court found that the broker "should have known about [the insurer's] rules regarding the initial premium and automatic withdrawal."  *Id.*  The court held that the policy never became a binding contract because the insureds "never paid the demanded initial premium to [the insurer], despite the fact their agent knew or should have known that the premium could not be paid by automatic withdrawal."  *Id.*

Here, the Trust admits that the beneficiary provision that it requested was "unusual," and that Mondo was aware of that fact.  Pl. Resp. at ¶ 47.  Indeed, according to the Trust, Mondo

specifically discussed beneficiary provision with Tuerk because it was so unusual. Despite the atypical nature of the beneficiary designation sought by the Trust, Mondo stated in the RFP that "[y]our normal life and AD&D contract will suffice." Ex. 2 to Def. SOF at 2913. Because Mondo was aware that the requested beneficiary designation was unusual, and therefore would not appear in an insurer's standard policy, he should have taken the time to read the policies to verify that they included the requested designation. Even "the most casual examination of [the] polic[ies]" would have revealed that they did not contain the requested beneficiary designation; therefore, Mondo is charged with knowledge of the beneficiary provisions, and that knowledge is imputed to the Trust. See 3 Couch on Ins. § 46:21 ("where the most casual examination of a policy by the insured's agent who procured the policy and discussed it and its coverages with the insurer's vice president would have revealed to the agent the coverage afforded by the policy, the agent is charged with that knowledge and such knowledge is imputed to the insured").

Finally, LINA contends that the Trust could have requested a copy of the policies from LINA or Mondo, and that, because the Trust had access to the policies, it is charged with knowledge of their terms. As LINA argues, even assuming that the Trust did not receive copies of the policies, that does not necessarily absolve it of its duty under Illinois law to learn and know the contents of those policies. Illinois courts have held that an insured who does not receive the policy nevertheless may be charged with knowledge of the contents if the insured is on notice that he should have received a copy of the policy, the policy was available, and the insured was not prevented from reading it. See *Maxton v. Garegnani*, 627 N.E.2d 723, 728 (Ill. App. Ct. 5th Dist. 1994) ("Regardless of whether the insured received the policy, an insured is typically charged with notice of the contents of the insurance policy"); *Dobosz v. State Farm Fire & Cas. Co.*, 458 N.E.2d 611, 616 (Ill. App. Ct. 2d Dist. 1983) (insured could be charged

with knowledge of policy where he received the transmittal sheet which put him on notice that he should have received a copy of the policy); *Schoonover v. American Family Ins. Co.*, 572 N.E.2d 1258, 1264 (Ill. App. Ct. 4th Dist. 1991) (insured could be charged with knowledge of policy where he received a letter referencing policy which put him on notice that a policy was issued and that he should have received a copy of the policy).

Each of those requirements is met in this case. The fact that the Trust paid premiums for eleven months – and submitted a claim upon Knight's death – indicates that the Trust was on notice that it should have received a copy of the policies. The Trust could have obtained copies of the policies if it had requested them from LINA (and likely from Mondo as well). And the Trust does not argue that it was prevented from reading the policies.

In sum, because the Trust's agent, Mondo, should have read the policies, such that Mondo is charged with knowledge of the beneficiary provisions, and because the Trust itself certainly could have obtained the policies from LINA and Mondo, the Trust is charged with knowledge of the terms of the policies under Illinois law.[10] The Trust's failure to object to those terms, as well as its payment of the premiums, constituted acceptance of the policies. Therefore, LINA's motion for summary judgment is granted as to Counts I and II.

### C.    Count III – Breach of Contract

In Count III, the Trust contends that LINA breached the group life insurance policy by failing to pay the Trust "any part of the monies owed it as a beneficiary under the Agreement."

---

[10] The Trust contends that even if it had knowledge of the terms of the policies, it could not have appreciated the discrepancy between the beneficiary provisions that it requested and those actually set forth in the policies, as the language in the policies does not preclude the naming of the Trust as a beneficiary. The Court disagrees that the discrepancy between the requested beneficiary provision and the beneficiary provisions in the policies is not readily apparent. Moreover, the Court need not resolve whether the Trust could have achieved its objective of receiving 50% of the death benefit either directly through the policy terms, or indirectly by requiring its members to designate the Trust as a 50% beneficiary, because there is no dispute that Knight did not name the Trust as a beneficiary.

While LINA has the burden of establishing that there are no genuine issues of material fact for trial at this procedural posture, see *Celotex Corp.*, 477 U.S. at 323, to survive summary judgment, the Trust must present credible evidence on all matters upon which it bears the burden of proof at trial, including the elements of its breach of contract claim. See *id.* at 322-23. As discussed above, those elements include offer and acceptance.

The Trust's theory appears to be that the RFP constituted an offer, which LINA accepted, thereby giving rise to an enforceable contract under which the Trust is the beneficiary of the group life policy. A proposal – like the RFP in this case – is a valid contractual offer if it "induces a reasonable belief in the recipient that he can, by accepting, bind the sender." *Architectural Metal Systems, Inc. v. Consolidated Systems, Inc.,* 58 F.3d 1227, 1229 (7th Cir. 1995). "A lack of essential detail would negate such a belief, since the sender could not reasonably be expected to empower the recipient to bind him to a contract of unknown terms." *Id.* In contrast to an offer, "a mere 'manifestation of *willingness* to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent.'" *Cobb-Alvarez v. Union Pacific Corp.*, 962 F.Supp. 1049, 1054 (N.D. Ill. 1997) (quoting Restatement (Second) of Contracts § 26 (1981)).

The Court concludes that the RFP was an invitation to negotiate, not an offer. The RFP requested an insurance rate quote on the proposed policy. Therefore, it lacked an essential term, see *Gothberg v. Nemerovski*, 208 N.E.2d 12, 18-19 (Ill. App. Ct. 1st Dist. 1965) (the rate of insurance is an essential element of a contract to procure insurance), and could not have induced LINA to reasonably believe that, by responding, it could bind the Trust to a policy regardless of the insurance rate quoted.

Even if the RFP were an offer, no contract was formed under which the Trust was the beneficiary because LINA did not accept the terms of the RFP. Under Illinois law, an acceptance must comply strictly with the terms of the offer in order to result in a binding contract. See *Venture Associates Corp. v. Zenith Data Systems Corp.*, 987 F.2d 429, 432 (7th Cir. 1993). "A response to an offer to enter into a contractual relationship that does not comply strictly with it – that is, that is not the 'mirror image' of the offer – is not an acceptance, but a counteroffer." *Nomanbhoy Family Ltd. Partnership v. McDonald's Corp.*, 579 F. Supp. 2d 1071, 1092 (N.D. Ill. 2008). Here, the Trust does not explain how LINA manifested acceptance of the RFP. The only possible manifestations of acceptance the Court can conceive are Tuerk's statements to Mondo or the issuance of the policies, neither of which constitutes a valid acceptance.

If Tuerk's statements to Mondo are considered the acceptance, then the resulting contract would be invalid because it would be missing essential terms, including the rate of insurance. See *Gothberg*, 208 N.E.2d at 18-19 (rate of insurance is essential element of contract for insurance); *DiLorenzo v. Valve and Primer Corp.*, 807 N.E.2d 673, 678 (Ill. App. Ct. 1st Dist. 2004) ("A contract may be enforced even though some contract terms may be missing or left to be agreed upon, but if essential terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract.") (citation omitted). Nor does LINA's issuance of the policies constitute a valid acceptance because the policy did not strictly comply with the terms of the RFP, particularly with respect to the beneficiary provision.

In sum, the Trust has failed to adduce any evidence that a contract under which it was the beneficiary of the group life insurance policy ever was formed between the parties. Therefore, LINA's motion for summary judgment is granted as to Count III.

D.    **Count IV – Unjust Enrichment**

In Count IV, the Trust alleges that LINA has been unjustly enriched by failing to pay the Trust "the monies owed it as a beneficiary under the Agreement," cmplt. ¶ 44, and by failing to refund the Trust "any part of the premiums * * * it paid to [LINA] under the Agreement," *id.* ¶ 45. In its motion for summary judgment, LINA argues that the Trust's claim for unjust enrichment is improper because an express contract governs the relationship between the parties. The Trust responds that it is pleading unjust enrichment in the alternative to its breach of contract claim.

Under Illinois law, a claim for unjust enrichment cannot be maintained where the relationship between the parties is governed by an express contract. See *Utility Audit, Inc. v. Horace Mann Service Corp.*, 383 F.3d 683, 688-89 (7th Cir. 2004); *Adams v. American Intern. Group, Inc.*, 791 N.E.2d 26, 31 (Ill. App. 1st Dist. 2003). The reason for this prohibition is to prevent "a party whose expectations were not realized under the contract from nevertheless recovering outside the contract." *Utility Audit, Inc.*, 383 F.3d at 688-89. The federal rules allow a plaintiff to plead inconsistent claims in the alternative. See FED.R.CIV.P. 8(e)(2). However, a plaintiff may not include allegations of an express contract governing the parties' relationship in its unjust enrichment claim. See *Citadel Group Ltd. v. Sky Lakes Medical Center, Inc.*, 2008 WL 1924958, at *7 (N.D. Ill. Apr. 30, 2008) ("when a party has incorporated allegations of a specific contract into an unjust enrichment claim, courts in this district have granted motions to dismiss those unjust enrichment claims"); *The Sharrow Group v. Zausa Dev. Corp.*, 2004 WL 2806193, at *3 (N.D. Ill. Dec. 6, 2004) (dismissing unjust enrichment claim that incorporated allegation that "valid and enforceable agreements" governed the parties' relationship); *Canadian Pac. Ry. Co. v. Williams-Hayward Protective Coatings, Inc.*, 2003 WL 1907943, at *5 (N.D. Ill. Apr. 17,

2003) (same).

Here, the Trust incorporates by reference paragraphs 1 through 40 of its complaint into the unjust enrichment claim. Cmplt. ¶ 41. In paragraphs 37 and 39, the Trust alleges that LINA breached "the Agreement" or "contract" between the parties. Moreover, in Count IV itself, the Trust alleges that LINA is in "material breach of the Agreement." Cmplt. ¶ 42. Because the Trust included allegations of the breach of a specific contract in its unjust enrichment claim, LINA is entitled to summary judgment on that claim.

LINA also contends that its motion for summary judgment should be granted as to Count IV because unjust enrichment must be supported by allegations of unlawful conduct, such as fraud, duress, or undue influence. The Trust responds that Illinois law does not require a showing of wrongdoing in order to state an unjust enrichment claim. Both LINA and the Trust cite cases supporting their positions.

Other courts in this district have observed that Illinois case law on this point is confusing, as there appear to be conflicting cases. See *Citadel*, 2008 WL 1924958, at *7 n.9 ("It is unclear whether Illinois law requires a claimant to show wrongdoing in support of an unjust enrichment claim."); *In re Sears, Roebuck & Co. Tools Marketing and Sales Practices Litigation*, 2006 WL 3754823 (N.D. Ill. Dec. 18, 2006) ("The law regarding whether a plaintiff must also show wrongdoing is initially confusing because there are decisions that go both ways."). For example, some courts have stated that recovery for unjust enrichment is permitted only when there is "unlawful or improper conduct as defined by law, such as fraud, duress, or undue influence." *Alliance Acceptance Co. v. Yale Ins. Agency, Inc.*, 648 N.E.2d 971, 977 (Ill. App. Ct. 1st Dist. 1995) (citation omitted). By contrast, others have held that "[a] cause of action based upon unjust enrichment does not require fault or illegality on the part of defendants." *Stathis v.*

*Geldermann, Inc.*, 692 N.E.2d 798, 811 (Ill. Ct. App. 1st Dist. 1998); see also *Eighteen Investments, Inc. v. NationsCredit Financial Services Corp.*, 876 N.E.2d 1096, 1103 (Ill. App. Ct. 1st Dist. 2007). In this case, the Court need not decide whether the Trust was required to show wrongdoing because the unjust enrichment claim nevertheless fails because the Trust alleged the breach of an express contract in Count IV.

### E. LINA's Counterclaim

Finally, LINA seeks summary judgment in its favor on its counterclaim, which alleges that the Trust breached both of the policies by failing to pay the premiums due for the months of August and September 2004. To prevail on a breach of contract claim under Illinois law, a plaintiff must show: (1) the existence of a valid and enforceable contract; (2) performance under the terms of the contract; (3) defendant breached the contract; and (4) plaintiff suffered an injury as a result of the defendant's breach. *Burrell v. City of Mattoon,* 378 F.3d 642, 651 (7th Cir. 2004).

The Trust disputes only the first element – the validity of the policies. Above, the Court determined that the policies are enforceable. Therefore, LINA's motion for summary judgment is granted as to its counterclaim. LINA is entitled to recover from the Trust the unpaid premiums.[11]

---

[11] LINA also requests interest and costs. LINA has not identified what it contends to be the appropriate interest rate, nor has the Trust addressed LINA's request for interest and costs. Thus, the Court requests additional briefing on LINA's request for interest and costs. LINA is given until 4/12/10 to provide a supplemental brief on why it believes it is entitled to interest and at what rate; the Trust is given until 4/19/10 to respond to LINA's submission; LINA is given until 4/26/10 to reply. After considering those additional briefs, the Court will issue a final judgment in this case.

## IV.    Conclusion

For the foregoing reasons, Defendant's motion for summary judgment [195] is granted.

Dated: March 29, 2010

_____
Robert M. Dow, Jr.
United States District Judge